Good morning, your honors. May it please the court. My name is Amy Austin and I represent the appellants in this case, Mr. Brown and Mr. McCullers. Gregory Sheldon at trial represented Mr. Brown and he's at council table. Your honors, the police violated the Fourth Amendment rights of both Mr. McCullers on July 23rd, 2021. On that date, officers of the Richmond Police Department seized both men without the requisite reasonable articulable suspicion required by Terry and the well-established case law from this court requiring specific articulable facts that the men were engaged in that the officers did seize both men immediately upon coming into contact with them. This seizure of both men was based on one thing, an undated video posted to an Instagram account not belonging to either of those individuals and that posting was at least one to two hours prior to the officers viewing it and there is no sound on this video and no evidence whatsoever as to when it was filmed. The district court also found that the officers did not know when the Instagram video was filmed and that the officers arrived at the apartments where Mr. Brown and Mr. McCullers were found between 75 and 120 minutes after the video. Judge Gibney conducted a very extensive and thorough hearing about all this, didn't he? There was an extensive hearing, your honor. There was testimony by several officers. There was body-worn camera footage shown at the hearing and then is contained in the joint appendix in this case, yes. After viewing this complex and saw four individuals standing around and walking toward a stairwell. Now the video that the officers observed, the video that they had no idea the officers when this video was filmed, had a lot more than four individuals in it. In the real-time video that the officers testified that they watched surveillance camera that was at the apartment complex. They watched that real-time video as they were traveling to the apartment complex and saw many individuals get in a car and leave. So by the time they got to the apartment complex, all they saw were four individuals walking toward a stairwell. There was no running. There was no illegal activity observed by any of those four individuals. The district court also found that the officers did not know whether the guns depicted in the video were real or fake. Other than the officer recognizing one of the individuals in the video as a gang member, and that person is neither Mr. Brown nor Mr. McCullers. A lot of this is That's right, but these facts aren't clearly erroneous. These are the facts that the district court found, and that's why I'm repeating them, that it was the conclusion that this amounted to reasonable articulable suspicion. That is what we are asserting was incorrect by the district court, and that's reviewed de novo. Other than the officer recognizing one of the individuals, the identity of either Mr. McCullers or Mr. Brown. These facts simply do not support the district court's conclusion that the seizure of Mr. Brown and Mr. McCullers was justified because the officers reasonably believed they had recklessly handled firearms, and that they might still have guns in their possession. This is the finding that we are asserting was an error by the district court. Significant in this case is that Mr. McCullers and Mr. Brown were not known to the officers, and therefore the officers had no reasonable articulable suspicion that either had a felony conviction, thus making possession of what looked like a gun. And in this case, when the officers arrived at the apartment complex and saw four individuals, they approached that apartment complex, approached the individuals who were walking, they were not in headlong flight, they were not running from the officers, and then when some of the individuals began walking up the stairs, the police started running, pulled out their guns, pointed their firearms at Mr. McCullers and Mr. Brown, and told them to get on the ground and seize them immediately. They had not seen any evidence of firearms, they had not seen any evidence of illegal activity, and that gave them any reasonable articulable suspicion. No particularized facts that either of these individuals were engaged in criminal activity. And in U.S. v. Black, this court held that suspected possession of a firearm by a person who is not known to be a prohibited person is not a basis for a warrantless seizure. Whereas state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention. In other words, possession of a firearm is not the default status. And that's precisely what happened in this case. Well, it's not precisely, you got to explain the video, right? I mean, this isn't a story where you have a group of people who are on a video with guns in their waistbands, or holding a gun, right? That's, I mean, we've seen the video, that's not the video, right? This is not just mere possession. Well, it's... Or that, do you think your argument turns on that? That I, that I view this video, and I think that there's no reasonable suspicion to believe that reckless handling of firearms has taken place? Well, Your Honor, reckless handling of a firearm or brand... Is that, is that what it depends on? So if I view the video, and believe that's reasonable suspicion of reckless handling of a firearm, that's not because that video is undated, and the district court found that there is no evidence as to when that video was made. And this is when the police approach the apartment complex, it's 5 a.m. in the morning. This is the Instagram account. It's an Instagram account. A video has been posted. Right, a video is uploaded to the... I don't know where the video came from, how long it's been there, it's just on... Who put it up? That's correct. You just have a video. You have a video. Eight people pointing a gun at a... Camera. Camera. At a phone. The person who's video, who's taking the video is doing the selfie maneuver. Right. And so, it's, the guns are pointed at a phone. A lot of the guns, it is clear that the, there are no fingers on the trigger. Are there any identifiers of who those eight are? No. You don't know anybody? The officers don't know anybody in the video except they recognize the person who was taking the video. And his initials are JS in the joint appendix. But other than that, they don't know any of the other individuals. And so, I do not believe that if the court does find, and we don't believe the record supports it, but if the court does find that there was reckless handling of the firearms, it still is based on that video. Richardson alluded to it, that seems like to me has got to be something there because we've got too much case law that says it's okay to walk around with guns. Guns you can walk around with in a state where it allows for a weapon to be carried and stuff. So, there's no crime being committed. That's right. I mean, it's kind of just the way our society is. You can show a video with a thousand people with guns, you don't have a crime being committed just because they got a gun. And so, you come up with this misdemeanor of recklessness. And I don't know, I guess he could have been walking across the street. It's a misdemeanor. Or any, I don't know what the Supreme Court, and we haven't kind of gone there as to how much is needed. That's kind of what you got here. You got under our law, I didn't write it, probably wouldn't have written it, but it's the way it is. That's legal. Nothing wrong with carrying a gun around. That's correct. And that's what the court held in black. This court held in black is that when you're in a state where you can carry a firearm, possession of it isn't enough for a warrantless seizure of an individual. But the possession is only seen by the officers when viewing this video. And the officers have no idea when that video was filmed. They then arrive at the apartment complex, and that video is made. And when they arrive at the apartment complex, cannot support reasonable or articulable suspicion and support the officer's actions in this case. Furthermore, reckless handling of a firearm or brandishing requires conduct that falls between criminal negligence, which is the same that's necessary for involuntary manslaughter and ordinary negligence. It's reckless conduct that, with an awareness, that serious injury will likely result. And after viewing that video of what is a selfie video taken of many individuals that are pointing what look to be firearms at a cell phone does not constitute conduct that or or is you agree that there's no question is not whether you could convict the people on the video of the offense. Right. The question is whether there's reasonable suspicion of criminal activity. Reasonable suspicion of criminal activity. Yes, I just think your argument is, I don't know that you could convict them based on the video. We could debate that argument, but that argument seems different than the question that we have. Well, and my point is, there are problems with whether what is on the video actually constitutes reckless handling of a firearm. But the fact is that video, there is no indication when that video was made, when it was filmed. And it's not often that we we have a situation where we have a social media posting. And then we have wearing the same clothing on in the actual surveillance as they were in the social media video. And the the officers said, okay, they at least link up the social media posting with the they are wearing the same clothing. They're basically in the same location and pretty close times are pretty close together. And so then the question coming, are they committing a crime? But the officers, I don't chapter and verses to that. But the video posting as the district court found as a factual matter, indicated they were brandishing and basically brandishing firearms at an odd hour of the morning. And that is a crime under Virginia law. And there's a question whether all of this is not, it's not a general high crime area that we're talking about. And I, I think one of the useful points that has been made by my colleague and others is that you can't make some loose accusation about a high that just bears down on the perfectly innocent people who just may happen to live in a high crime area. But there's a this is not a big high crime area. It's place where there's high gang activities and they've engaged in shootings and, and woundings and murderers in this apartment complex. I can't imagine what it's like for number of good citizens and innocent people who live in that apartment complex to be subject to this kind of activity makes them and their their children and families scared for their lives. And so it's not, it's not just that the police were running around snooping in a high crime area, which I think is way too broad. It's that very specific things were going on here. And, and brandishing was consistent with those kinds of things. It's, it's, it's, it's very focused here. Well, Your Honor, if I may respond to that briefly, I respectfully disagree that it's focused and the record in this case supports this position. Once Mr. Brown was seized by the police, he kept saying, Don't you want my name? Don't you want my information? Mr. Brown was handcuffed, seized, handcuffed and made to stand in a hallway of the apartment complex for a long time before any questions were ever asked. And he and both Mr. McCullers were asking the police, why, what happened? What's going on? Why are you stopping us? What's going on? And the police officer, Officer Frias told Brown, and that's at JA 401 on one of the body cameras, quote, This is what we do all the time. We just jump out, see what's going on. Okay, thank you. And can you, you can embellish or elaborate on that answer during your rebuttal time, which you've reserved? Thank you, Your Honor. Yes. All right. Mr. Anthony, we'd be pleased to hear from you, sir. May it please the court? I do have a little bit of a cough. I don't have COVID, but in case I get interrupted, just to let you know, Judge, the district court correctly found that the officers had a reasonable suspicion to seize and pat down Mr. Brown and Mr. McCullers on the early morning hours of the day that they were arrested. I want to touch on a couple of different things that the defense counsel has brought up. First of all, with respect to what the court found in this case, as a matter of fact, one of the things the court found that I think is very important in this case is that the Instagram posting, it was reasonable to conclude from the court's perspective that the Instagram posting was made sometime within 60 to 120 minutes from when the officers actually arrived on scene. And how did the court reach that conclusion? First of all, the Instagram posting actually in the top, I believe the top right corner, indicates something as if it was one hour or less old or one hour or more old. And what the posting actually showed was one hour when Officer Frias first observed the posting. Officer Frias then lets other officers know. That would tell you when the video was done, it is reasonable to understand on Instagram, people put videos up there that might be weeks, months, years old? Yes, sir. Or it could have been any other time. I get your point. Posting is something, but all it is is posting. Yes, there are several other reasons other than when it was posted, while the court found it was reasonable to conclude that it was posted within 120 minutes. It also found that the Instagram photo was made in front of building 4024 in the Belt Atlantic parking area. When you look at what the officers did after they first observed the Instagram photo, they went to real-time footage and they could see that individuals wearing the same clothing as was in the... Individuals or individual? Individuals. Other than that purple hoodie, who was wearing the same clothing? Mr. Brown was wearing the purple hoodie, if I'm not mistaken. And then Mr. McCullers was wearing a black hat with a Chicago Bulls emblem. And I believe he had multicolored underwear on. I think they ended up being Ethica. And you're saying the surveillance video showed Mr. Cullers? I'm sorry? The surveillance one showed him? Yes, sir. As the officers initially watched the real-time surveillance footage and then as they approached... They saw Mr. McCullers? They saw Mr. McCullers and Mr. Brown. And they saw Mr. Brown? Did he have a gun? Did Mr. Brown have a gun? They did not see them with guns in the real-time surveillance footage. But what they did see is the same individuals in front or near the same building, 4024. Approximately 60 minutes after... Excuse me. Yeah, approximately 60 minutes after that Instagram posting was first made. Were these clothes primarily jackets that they recognized? For Mr. Brown, yes, it was the purple jacket. He also wore dreadlocks that evening. Dreadlocks? Dreadlocks, yes, sir. And you would think that that's something that you can tell... That's not something he could have had the day before or two days earlier? Had that jacket on two days earlier? He had to just have it on within two hours. You put dreadlocks on, two hours. Same one, because you had dreadlocks. Certainly not dreadlocks within a couple of hours, Judge. The purple jacket, certainly that's something you can wear from day to day. But then when you look at the other surrounding factors... What about the other clothes? I'm intrigued with this clothes thing here, because I don't know if it shows that from what I saw in the video. I didn't see Mr. Brown's clothes at all, to be honest with you. But I'll go back and take a look at it. There are two different pieces, though. One, they see two things that confirm. One is the real-time video, and that's Mr. Brown. The second piece of information, I think you're talking about with the bull's hat and the funny underwear, was when they pulled up. When they pulled into the spot, they identified him with the bull, who turned out to be Mr. McCullers. They didn't know that at the time. The bull's hat and the funny underwear. It wasn't on the video, it was when they pulled up. But that's still before they take any action. So they've now done two different things to confirm that this video was taken in recent time. Yes, sir. I apologize if that's unnecessary. Don't jump to that conclusion. They've done two things to confirm that you have an individual in with a purple hat on, and one with a different hat on, that you don't even know who he is. That's the same in what you saw in the surveillance. But it doesn't tell you anything about any real-time. I mean, that's a jump. It's nice to go there. But in that surveillance vehicle, were they committing a real, live one? Were they committing a crime? Or was there some ongoing criminal activity going on? So we can back up to where we talk about the reckless handling of the firearm. No. They suspect. They create suspicions. There's some criminal activity. But then you come to the video. The question is, do they identify any criminal activity? Because Judge Wilkerson said it corroborates it. Is there anything in that video that identifies criminal activity? In the real-time surveillance? Yes. No, sir. So you come. You have a reasonable suspicion there's something going on. You then get a live vehicle. Nothing. So, why not? Okay. You've now determined there's no continued criminal activity. Why do you need to do any more? Well, a couple things. One thing. The Instagram photo, we believe, showed, and the district court found, showed the reckless handling of firearms. Right? So the officers then go to the real-time surveillance footage. They see... Which is a misdemeanor. It is a misdemeanor. And we haven't quite gotten there yet, because I suppose they could have showed them jaywalking. And you could use that on the same basis. Right. I have to, because it's a misdemeanor. And you're not differentiating between misdemeanors and felonies, so it could be a misdemeanor. I'm differentiating between a misdemeanor that involves walking across the street and one that involves handling firearms in the early morning hours. Firearms, that's a problem. The lawful possession of a firearm, which you can have, and the way you handle it creates a greater crime than jaywalking or something like that, I guess is what you're saying. It wouldn't be lawful possession if it's a misdemeanor. So it's an unlawful possession of a firearm. Unlawful use. Okay. Possession is lawful, is it not? Presumptively. I'm not being debative. I'm just saying, we're in a Second Amendment situation here. We don't want to go there. Okay, we can distinguish between possession and use. In this case, we would say the unlawful use of a firearm is the reckless handling of a firearm. And I think what the officers determined is that this time of day, having residences both behind them, right? The 4024 building. And then if you look at... So I'll move you from that. I will agree with you. If maybe it's sufficient to show that in the past, there's been a completed misdemeanor, then you get the video that shows nothing. So it's not continuing. It's not continuing, but again, I think the officers had to deduce at that point because of the residences behind them. And if you look at JA 173, there are also residences across the street from where these individuals are pointing the guns, even though it looks like they're pointing it at the camera, the camera phone, which is shown on the Instagram photo, there are residences over there. And they have their hands on these guns. The officers said, we need to go investigate that. And so they did that. Well, the first thing before they even went to investigate, they checked the real-time footage. No, they don't see anyone at that point recklessly handing firearms. They did see an individual with, I believe, a drum magazine that looked to be a drum magazine in his waist area. So they go out there. Detective Frias leads the way. He identifies both Mr. Brown and Mr. McCullers. And as he approaches the scene, he tells the other officers, hey, I see two guys that were in that Instagram photo. He tells them to stop. Neither of them actually react to this stoppage nor did they get on the ground, as I think a defense counsel misstated. What happens is Detective Frias approaches Mr. Brown. Mr. Brown goes to reach near his midsection. He says, stop reaching. Mr. Brown stops reaching. And then he ends up putting him in handcuffs. This is testimony, but if you look at the video, it certainly doesn't bear that out. I believe that the district court found that to be the case, that the- It's not a testimony, but we have the video. That video showing that. I mean, I'm just asking. If you look at the video, it's not there. I understand, and I'll tell you, when you're dealing with cases like this, officers are pretty smart. You know you've got to say certain things. You've got to say, are you reaching for something? I mean, that sort of creates an atmosphere. The problem here is, there's none of that on the video. That video's not showing that officer seeing that nor him reaching or any of that stuff on it. Well, I'm not going to ask this court to take the district court's finding for its own or not. I'm just going to say that the district court found- I'm sure we can. Based upon evidence, it's that contradictory. Yes, sir. As to Mr. McCullers, Mr. McCullers is also told to stop. Instead of doing so, he climbs the stairs towards, I believe, the third floor. Detective Sergeant Rogers ends up going and stops him. He does end up getting on the ground eventually where they find a firearm. So taking all of that together, Judge, what we have is a set of individuals recklessly handling a firearm on Instagram between 60 to 120 minutes between the officers arriving. The officers then approach them, ask them to stop. They're in the same area, wearing the same clothing. They're in a place where it's known for gun violence, it's known for gang violence. And all of these taken together is the reason why the district court said it's reasonable to conclude that this Instagram posting was made in close temporal proximity to the officers taking any action. After that, the officers, again, recover a firearm from Mr. McCullers first. They ended up not finding anything on Mr. Brown initially. Mr. Brown said that he had a colostomy bag, which ended up forestalling some of the officer actually searching him. Officer Frias stands there for, I believe, five minutes is what the video shows before he relays biographical information from Mr. Brown to Detective Story. Detective Story, Judges, is the individual in this SVIU unit who's responsible for running all of this information that he gets from all of these suspects. And just so we understand what he's running at this point, he's running not only biographical information, the name, date, excuse me, name, birthday, social security number of all these individuals. He's also running information about their criminal histories. He's running information about the firearms that were found on them. I believe at that point there were three firearms recovered of the four suspects. And then he's also just getting general background information before he decides whether to let some individuals go on. The overall point is you're up here on a clear air of standard from a district court. And it did a very conscientious job looking at all the evidence and in what sense. And people try to get out of this by saying, oh, it's a mixed question of fact and law. But it's not really. The facts found by the district judge here, and what I repeat was a very conscientious index. They're sufficient to establish, I think, reasonable suspicion, which it's important. It's obviously known by everybody that reasonable suspicion, I mean, probable cause doesn't amount. We don't have to prove guilt beyond a reasonable doubt. Probable cause, I guess the hierarchy goes proof beyond a reasonable doubt, and then clear and convincing, and then probable cause, and then reasonable suspicion. And in that hierarchy, reasonable suspicion is the least stringent, or the least demanding. And when you combine the reasonable suspicion standard with the factual findings under clear error review, it's a pretty strong case, isn't it? I believe it is, Judge. I believe from the point of determining both how reliable or how much the court could rely upon this video when it was posted, all the way up until the point of determining when and whether to pat down Mr. Brown and Mr. McCullers. The reasonable suspicion standard, as the court found, is actually very appropriate in this case and should be upheld. If there aren't any other questions, I'll take my leave. We thank you very much, Mr. Anthony. We appreciate it. Ms. Austin, you've reserved time for rebuttal. Thank you, Your Honor. I would like to point out several things that were addressed. But first of all, I would like to point the court to the Curry opinion, the Fourth Circuit opinion in Curry. And in that case, the government conceded that the stop was a suspicionless stop, that there was not reasonable articulable suspicion to seize Curry. That case then examined what exigent circumstances were. And while we aren't dealing with exigent circumstances. I don't think the government conceded anything. It's impossible for me to get that impression from reading the brief. They list item upon item upon item that satisfied this less demanding standard. I'm sorry. Are you referring to Curry or this case, Your Honor? I didn't understand what you said at the beginning. What's that? My point in pointing out Curry is that in that case, the facts are similar to the facts in this case, but give the police so much more. In that case, the police were in the area and heard gunshots and approached a group of individuals and seized Curry. And when they had the suppression hearing and it was granted, they did not argue reasonable articulable suspicion. They said that the stop was suspicionless. So they conceded on facts that were worse than what we have in this case. So I'm pointing that out for a lot of reasons. Curry has some excellent language in it. But in this case, the facts are the police aren't in the area. They did not observe anything on their own with their own eyes. There are no visual observations of their own. There was real-time surveillance when they arrived at the area. Well, Your Honor, that camera? I know of no rule that says reasonable suspicion cannot develop unless the police are actually in the area observing the unlawful activity. I'm not suggesting that the police had to be in the area, Your Honor. You did make a point about that they weren't in the area, but we have reasonable suspicion all the time by people. There's all these debates about whether the informant was reliable or anonymous or this or that, and those are good debates. But they all proceed on the premise that an informant can establish reasonable suspicion. I wonder whether a social video isn't more reliable than an informant, what it really is. Well, Your Honor, the fact is Terry states that brief investigatory stops can happen if they are based on reasonable, articulable suspicion of criminal activity. Do you agree if they saw a video of a street and they saw somebody jaywalking that they could walk up to that person and ask them about the jaywalking? They could walk up to the person. In fact, they've got reasonable suspicion to tell them they have to stop, right? Not just voluntarily. They can say, stop, talk to me about the jaywalking. They've got reasonable suspicion to do that. If they observed it. Yeah, if they saw it on the video. Well, you're saying the video, which video? A real-time video. Okay. And so that's just it. But you agree that they would have that authority, right? It doesn't matter if there's a misdemeanor, right? You're allowed to arrest for a misdemeanor if it's conducted in your presence. But could they pat that person down? Would they have reasonable suspicion under Terry to believe that the jaywalker was carrying a firearm? No. So they couldn't pat him down, but they could stop them. They could ask if they would speak to them, yes. Not just ask. They could order it because they have reasonable suspicion that a crime has been committed. So they can order that they stop and talk, right? Yes. But in this case, they didn't. That's a good yes. Excuse me? But that's not here because there's no arguable misdemeanor that's occurring on that live video. Precisely. It's wonderful. Yeah, if you got there and saw that live video, same group of people pointing that gun, that's a different case. You have no crime being shown on that live video. That's right. And they observed it the whole way they were driving to the apartment complex. They were looking at the surveillance video at the apartments, and there is no indication that Brown or McCullers or any of the other individuals on that video possessed a firearm. When they arrived at the apartment, they rushed into the stairwell where those individuals were. They did not see guns. They did not see any indication of criminal activity. And both those individuals were seized. And they say that they could see Mr. Brown on the third floor of that apartment. The body-worn camera is clear. The officers are rushing with guns drawn. Mr. McCullers drops to the floor, and all the officer can see as he goes up the stairs are Mr. McCullers' eyes as he's lying on the ground like he was ordered to do by the police. They do not investigate. Thank you very much, Counsel. We appreciate it. And I would like to thank both of you for your good presentations, and we will wish you a happy holiday season, and we will adjourn court sine die. This honorable court stands adjourned sine die. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, James Andrew Wynn, Julius N. Richardson